## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

**FRANTZ AUGUSTIN,**

**Case No.:** 1:21-cv- 7068

**Plaintiff,**

-against-

**ALS RESOLVION, LLC,**
**ALL ABOUT AUTOMOTIVE II INC., and**
**CREDIT ACCEPTANCE CORPORATION,**

**Defendants.**

-------------------------------------------------------------------X

## PLAINTIFF'S COMPLAINT

Plaintiff Frantz Augustin brings suit against Defendants ALS Resolvion, LLC, a repossession management servicer, All About Automotive II Inc., a repossession towing company, and Credit Acceptance Corporation, an auto-lender, for violations of New York General Business Law § 349 *et seq.* and committing conversion and, as to ALS and All About Automotive, violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, and in support alleges as follows.

## SUMMARY OF CLAIMS

Working in concert, Defendants stole Plaintiff's car and personal property. Plaintiff Frantz Augustin purchased a vehicle with a clean title: there was no lien on the car and no lien or lienholder on the title. Credit Acceptance Corporation ("Credit Acceptance"), an auto finance company with no security interest in the Vehicle when Mr. Augustin purchased it and a stranger to Mr. Augustin, instructed its co-Defendants to seize the Vehicle under the guise of repossession. Credit Acceptance hired ALS Resolvion, LLC ("ALS"), a repossession management servicer, who in turn hired All About Automotive II, Inc. ("Auto II"), a repossession tow truck company, who repossessed Mr. Augustin's vehicle. Accordingly, the

Vehicle was illicitly taken by Defendants. After multiple demands by Mr. Augustin, Defendants finally stated that they would release the Vehicle, but refused to return it, forcing Mr. Agustin to drive 75 miles to pick it up. Defendants – after nearly a year – continue to willfully refuse to return all of the items of personal property that were in the vehicle despite repeated demands for the same. For these reasons and others ALS and Auto II violated the Fair Debt Collection Practices, specifically 16 U.S.C. § 1692(f)(6) which prohibited, *inter alia*, the seizing of Mr. Augustin's vehicle and personal property without a valid security interest and default.  Credit Acceptance, ALS, and  Auto II are jointly and severally liable for the conversion of Mr. Augustin's vehicle and, in addition, the items of personal property he had in the vehicle and which, to this day, they willfully refuse to return.

## A.  JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 in that this dispute involves predominant issues of federal law under the FDCPA.

2.      The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in New York County, New York.

## B.    PARTIES

4.      Plaintiff Frantz Augustin ("Mr. Augustin") is an individual residing in Queens County, New York.

5.      Mr. Augustin is a "consumer" as defined by 15 U.S.C. § 1692a(3) as he was alleged to owe a debt on the Vehicle.

6.      Defendant ALS RESOLVION, LLC ("ALS") is a limited liability company organized under the laws of Delaware with its principal place of business in Atlanta, Georgia. ALS is a nationwide repossession management servicer who locates collateral and subcontracts local repossession agents on behalf of lenders and lienholders. ALS engages in business in New York and this suit arose out of ALS's business in New York.

7.      ALS's principal (indeed sole) purpose is enforcing security interests by, *inter alia*, sending hundreds of orders to repossess to repossession agencies, and ALS does so regularly. ALS took or threatened to take a nonjudicial action to effect dispossession or disablement of property where there was no present right to possession of the property claimed as collateral through an enforceable security interest and/or the property is exempt by law from such dispossession or disablement. Therefore ALS is a "debt collector" for the purposes of 15 U.S.C. § 1692f(6) as defined in 15 U.S.C. § 1692a(6).

8.      Defendant ALL ABOUT AUTOMOTIVE II, INC. ("Auto II") is a domestic corporation with its principal place of business in Kings County, New York.

9.      Auto II is a repossession agency the regularly repossesses vehicles and that is its principal purpose. Auto II took or threatened to take a nonjudicial action to effect dispossession or disablement of property where there was no present right to possession of the property claimed as collateral through an enforceable security interest and/or the property is exempt by law from

such dispossession or disablement. Therefore Auto II is a "debt collector" for the purposes of 15 U.S.C. § 1692f(6) as defined in 15 U.S.C. § 1692a(6).

10.    Defendant CREDIT ACCEPTANCE CORPORATION ("Credit Acceptance") is an auto finance corporation organized under the laws of the State of Michigan. Clover engages in business in New York. Credit Acceptance claimed to have a security interest Mr. Augustin's vehicle. This suit arose out of Credit Acceptance's business in New York.

11.    All of the misconduct by Auto II was in the scope of employment by ALS, as ALS retained Auto II with the intention of illicitly repossessing the Vehicle.

12.    ALS is jointly and severally liable for the conduct of Auto II.

13.    All of the misconduct by ALS was in the scope of employment by Credit Acceptance, as Credit Acceptance retained ALS with the intention of illicitly repossessing the Vehicle.

14.    Credit Acceptance is jointly and severally liable for the conduct of ALS, including but not limited to the negligent employment of Auto II by ALS.

### C.    STATEMENT OF FACTS

**Background: Sale of the Vehicle**

15.    In August of 2020, Mr. Augustin's old car broke down and he decided to buy a new car.

16.    He found an ad for a white Honda Accord ("the Vehicle") online being sold by a man named Louis Anthony Mendoza for $10,000. Mr. Augustin was told that the Vehicle had been purchased at an auction about seven months prior.

17.    On or around September 14, 2020, Mr. Augustin purchased the Vehicle and obtained clear title for the Vehicle. He checked the New York Department of Motor Vehicles to determine if there were any liens on the Vehicle, and determined there were none. Upon information and

belief, Mr. Augustin reviewed the same or similar information as is provided in the attached Abstract of Title Record by the NY DMV for the Vehicle. **Exhibit A**.

18.    The Abstract lists Mr. Augustin as the current owner and shows that clear title was issued to him on or around September 29, 2020. Importantly, there were no liens on the title.

### Repossession of the Vehicle

19.    On December 26, 2020, Mr. Augustin left his girlfriend's house in the Lower Eastside of Manhattan to get into the Vehicle and go home around 12:30 A.M. He realized that the Vehicle was not in the spot that he had parked it in.

20.    He called 311 to determine if the Vehicle had been towed, and was informed that the Vehicle was not in the system and that he should go to the local police precinct and report it as missing.

21.    At the local police precinct, an officer was able to determine that the Vehicle had been towed and repossessed by searching the license plate number. **Exhibit B** (Police Repossession Form).

22.    Mr. Augustin did not know at the time what "repossessed" meant, and the police officer told him it meant that he missed a payment on the Vehicle. That was very confusing to Mr. Augustin as he had not financed the Vehicle and paid for it fully and in cash.

23.    The police officer also told Mr. Augustin that the name for the Vehicle was not his – instead, it was "Thomas Markeith."

24.    "Thomas Markeith" is not listed as a current or prior owner in any of the NY DMV documents (as of May 17, 2021) for the Vehicle. **Exhibit A.**

25.    On December 26, 2020 Mr. Augustin called the towing company, Defendant Auto II, and Auto II told him that he could call them the next day.

26.    In fact, both Auto II and Defendant Credit Acceptance were closed the next day, December 27, 2020.

**Mr. Augustin has to go 75 miles to retrieve the Vehicle from an auction despite Credit Acceptance acknowledging it was wrongfully repossessed.**

27.    On December 28, 2020, Mr. Augustin called Auto II, informing them that there was a mistake and that he would be coming to retrieve the Vehicle.

28.    Auto II told Mr. Augustin that retrieving the Vehicle is "not that easy," that it could take as long as six months for him to get the Vehicle back, and they would only release the Vehicle to him with a release form from Defendants ALS and Credit Acceptance.

29.    Mr. Augustin then called Credit Acceptance to ask about the necessity of such a release, and the company told him that they could not provide him any information on the call because his name was not on the account, but they would call him back in an hour with more information.

30.    Credit Acceptance did not call him back, so Mr. Augustin called them back, and was told the same thing except that they would call him back in two hours.

31.    Getting nowhere with Credit Acceptance, Mr. Augustin went to Auto II to retrieve the Vehicle.

32.    At Auto II, he was informed that the Vehicle was being processed to be sent to an auto auction.

33.    Fortunately, the Vehicle was coincidentally arriving to the yard at just that time, so Mr. Augustin went over to the Vehicle to inspect it and see if there had been any damage from the towing.

34.    The driver of the tow truck asked Mr. Augustin if the Vehicle was his. When he responded yes, the driver demanded that Mr. Augustin turn over keys to the Vehicle and go back inside.

35.    Another representative from Auto II also requested the keys from Mr. Augustin. When Mr. Augustin asked her whether he would get his keys back after they had parked his car in the lot, she told him "No," so he refused to give them the keys.

36.    Auto II threatened to charge him $400 if they were "forced" to make a key for the Vehicle.

37.    At this point, Mr. Augustin called ALS and, while on hold with ALS, called the police. When the police arrived, they told him that it was a civil matter and he had to take it up with Credit Acceptance despite Mr. Augustin's protests that he had all the official documents showing the car was his and was not financed. He showed the police the title with his name and no liens listed.

38.    Auto II suggested to Mr. Augustin that the seller of the Vehicle might have scammed him and the original title could have been modified, but Mr. Augustin pointed out that, if that were, he should have become aware of it when he checked the NY DMV for liens.

39.    Realizing he would not be able to settle the issue that day, Mr. Augustin asked if he could retrieve his personal items from the Vehicle, and was told that he could not because he was not "Thomas Markeith," the person listed as the owner of the Vehicle on Defendants' paperwork.

40.    The police however intervened and allowed him to retrieve his wallet, identification, registration card, school bag, iPad, and license plates. That still left a number of personal items in the Vehicle, including but not limited to jumper cables, a high speed charger, a dashcam, a shovel, a large tote box, and a portable vacuum.

41.    Mr. Augustin tried calling Credit Acceptance again on December 28 and finally spoke with their title department. They had him send them a picture of his title, front and back, by

email, and Credit Acceptance told Mr. Augustin that they would process it within 24 to 72 hours. **Exhibit C** (Email of Title).

42.     Credit Acceptance also told Mr. Augustin that it appeared that their lien on the Vehicle has been lost, but that they would have to complete the investigation to be sure.

43.     Sometime between December 28 and December 30, 2020, despite Defendants having notice that Mr. Augustin's name was on the title for the Vehicle and there were no liens on the title, Defendants had the Vehicle sent out to Fairfield, NJ for auction.

44.     Defendants' transportation of the Vehicle for the purposes of having it auctioned in another state, 75 miles away, was willful conversion of Mr. Augustin's Vehicle.

45.     On December 29, 2020, Mr. Augustin called Credit Acceptance and was told the investigation was still pending.

46.     On December 30, 2020, Mr. Augustin called Credit Acceptance and they informed him that the investigation was complete, and they had indeed lost a lien on the Vehicle. Despite acknowledging that the Vehicle should be released to Mr. Augustin, Credit Acceptance informed him that the Vehicle had been sent to an auto auction.

47.     Mr. Augustin was in disbelief that they would send the Vehicle to an auction during the investigation, and asked where the auction was. Credit Acceptance told him to call back in two hours and receive instructions to get the Vehicle.

48.     Mr. Augustin called back two hours later and was informed that the Vehicle had been sent to Manheim NY Metro Skyline in Fairfield, NJ – 75 miles away.

49.     Mr. Augustin demanded an explanation for their sending the Vehicle so far away and now requiring him to go out and get it despite Defendants' error causing it to be seized. Credit Acceptance responded that, because it was the holiday season, that the matter would not be

settled until January 4, 2021. Credit Acceptance also told Mr. Augustin that if he went out there he could pick it up himself the next day, December 31, 2020, between 8 AM and 8 PM.

50.     When Mr. Augustin called on December 31, the auction lot told him that they do not do same-day appointments and that the release department had left at 12 PM that day and he would be unable to get the Vehicle.

51.     Finally on January 4, 2021, Mr. Augustin and his father drove the 75 miles to Fairfield, NJ to retrieve the Vehicle. Mr. Augustin suffered additional actual damages of loss of time and payment for gas and tolls just to retrieve his stolen Vehicle.

52.     The lot had Mr. Augustin sign a document titled "FULL RELEASE & INDEMNIFICATION." **Exhibit D** (Auction Release).

53.     However, the Auction Release specified Markeith Thomas as the "RELEASOR," and thus Mr. Augustin is not bound by any of the provisions of the Auction Release.

**Defendants refuse to return Mr. Augustin's personal belongings, forcing him to retain counsel, and still have not returned his personal belongings after three letters demanding their unconditional release.**

54.     While Mr. Augustin was able to retrieve his Vehicle, he was not able to retrieve his personal belongings.

55.     Auto II insisted that Mr. Augustin sign a form as a prerequisite for the return of his wrongfully taken personal property, which upon information and belief included a release of potential claims that Mr. Augustin has against Auto II and the other Defendants. Further, upon information and belief, not all of his items were available for his return during any of his attempts to retrieve them.

56.     As of the date of this filing, Mr. Augustin has still not been returned his wrongfully taken personal property despite several demands to all involved entities.

57.    Mr. Augustin was very frustrated, and retained and paid an attorney to assist in the retrieval of the personal property.

58.    On January 19, 2021, Mr. Augustin's attorney sent a letter to Auto II demanding that arrangements be made for the return of Mr. Augustin's personal property, and noting that he should not be required to sign any documents to retrieve them other than an acknowledgment of the items being returned to him. **Exhibit E** (January 19 Letter to Auto II).

59.    Also on January 19, 2021, a letter was sent to ALS demanding that arrangements be made for the return of Mr. Augustin's personal property, and noting that he should not be required to sign any documents to retrieve them other than an acknowledgment of the items being returned to him. **Exhibit F** (January 19 Letter to ALS).

60.    Auto II provided an email address to inquire further about Mr. Augustin, which Mr. Augustin's attorney sent a letter to on January 20, 2021 demanding that arrangements be made for the return of Mr. Augustin's personal property, and noting that he should not be required to sign any documents to retrieve them other than an acknowledgment of the items being returned to him. **Exhibit G** (January 20 Letter to Auto II).

61.    Despite providing preferred contact information, Auto II never responded to the January 20 Letter.

62.    On February 24, 2021, emails were sent to ALS (**Exhibit H**) and Auto II (**Exhibit I**) noting the lack of any response by either company to the previously sent letters and inquiring when the return of Mr. Augustin's personal property could be arranged.

63.    ALS and Auto II did not respond to these emails.

64.    On April 28, 2021, ALS was contacted a third time, noting the lack of response to the January 19 Letter and February 24 Email as well as the failure to arrange the return of Mr. Augustin's personal property unconditionally. **Exhibit J** (April 28 Letter to ALS).

65.    Also on April 28, Auto II was contacted a third time, noting the lack of response to the January 19 Letter and February 24 Email as well as the failure to arrange the return of Mr. Augustin's personal property unconditionally. **Exhibit K** (April 28 Letter to Auto II).

66.    Also on April 28 a letter was sent to Credit Acceptance noting that Mr. Augustin had not been returned his personal property unconditionally and demanding that arrangements be made to do so. **Exhibit L** (April 28 Letter to Credit Acceptance).

67.    And on April 28, a letter was sent to Manheim NY Metro Skyline noting that Mr. Augustin had not been returned his personal property unconditionally and demanding that arrangements be made to do so. **Exhibit M** (April 28 Letter to Manheim).

68.    In sum, ten communications were sent by Mr. Augustin's attorney to the Defendants and Manheim demanding the return of Mr. Augustin's wrongfully taken personal property, and every time the companies failed to respond and failed to arrange the return of Mr. Augustin's personal property.

69.    This repeated blatant refusal shows the conversion of the property is willful.

**Prior Misconduct of Auto II and ALS's Negligent Hiring and Supervision**

70.    ALS was negligent in its employment of Auto II because it knew or should have known about Auto II's history of misconduct and lack of proper licensing.

71.    On June 15, 2018, the Supreme Court of New York, County of New York, granted summary judgment to the New York City Department of Consumer Affairs against Auto II and its principal Francisco Martinez for "the sum of $32,534,500.00 and Martinez in the sum of

$4,280,000.00 for engaging in repeated and ongoing illegal towing operations in violation of the Administrative Code of the City of New York (Ad. Code) and the Rules of the City of New York (RCNY)." *City of N.Y. v. All About Auto. II, Inc.*, 2018 N.Y. Slip Op. 31279, at *1 (N.Y. Sup. Ct. 2018), attached as **Exhibit N** (*Auto II* Case).

72.     As the Order detailed, Auto II had previously been found guilty in an administrative order on August 13, 2015 for almost 7,000 counts of violating towing laws and deceptive practice prohibitions, including 2,804 instances of unauthorized towing, 124 counts of failing to maintain records of towing operations, 1,099 counts of failing to tow vehicles to an authorized facility, and 2,804 counts of overcharging vehicle owners. *Id.* at *2-3.

73.     Upon information and belief, Auto II's license to operate with the Department of Consumer Affairs ("DCA") expired April 30, 2016 and has not been renewed.

74.     Auto II was not licensed to tow vehicles in New York City when ALS employed them to illegally take the Vehicle, nor were they licensed to tow vehicles when they in fact took the Vehicle.

75.     In addition to a license being a prerequisite to legally towing vehicles in New York City, the license would also ensure via DCA requirements that Auto II is meeting basic requirements such as but not limited to having all of its trucks insured, licensed, and registered.

76.     ALS and Credit Acceptance had a duty to exercise reasonable care in its hiring, retention, and supervision of tow truck companies to repossess vehicles on its behalf, and it breached that duty through hiring Auto II, an unlicensed tow truck company with a history of unauthorized towing.

77.     In addition, Credit Acceptance had a duty of reasonable care to make sure that ALS was not hiring or retaining an unlicensed repossession tow truck company that has systematically

engaged in unlawful, deceptive, and abusive towing practices, thousands of times over a period of years. This duty of reasonable care includes but is not limited to a review of publically available documents concerning any repossession tow truck company being considered for hiring by ALS.

78.     Had ALS or Credit Acceptance performed even the most minimal of background checks, they would have learned (or did learn) about Auto II's history of misconduct and lack of license. For example, an internet search on Google of "ALL ABOUT AUTOMOTIVE II, INC" on August 11, 2021 produced on the very first result page, a copy of the Order (**Exhibit N**) and a disclosure that their license to tow trucks in New York City has expired since 2016 (**Exhibit O** (Auto II license status)).  See **Exhibit** P (Google search results, first page). Moreover, one of the first listings is also a fraud restitution form regarding the August 13, 2015 administrative order against Auto II stating:

> "**Restitution Claim Form – All About Automotive II, Inc. Customers**
>         A Tribunal found that All About Automotive II, Inc., which was located at 319 Devoe Street in Brooklyn, NY 11211, illegally towed vehicles from January 2014 to August 2014. If All About Automotive II, Inc. towed your vehicle during that time, you may qualify for restitution (a refund). Complete the form below."
> **Exhibit Q** (Auto II Restitution Form).

79.     An unauthorized towing of the Vehicle, the taking and refusal to return personal property in the Vehicle, and all of the accompanying injuries to Mr. Augustin, were foreseeable when Credit Acceptance and ALS hired Auto II given its history of misconduct and lack of license.

**The shocking theft of Mr. Augustin's Vehicle under false pretenses was very distressing, and to this day he remains scared that it could happen to him again.**

80.     The wrongful repossession of Mr. Augustin's Vehicle and the nightmare he went through to get it back has made Mr. Augustin very scared that the Vehicle could be taken again for no reason.

81.    When he drives and hears sound in the Vehicle, he worries it may have been damaged from all the times it was towed, and is still trying to figure out if anything is wrong with the Vehicle.

82.    Mr. Augustin doesn't like to get upset, but he kept getting provoked. Credit Acceptance in particular kept giving him false hope by telling him they were going to investigate and then failing to get back in touch with him.

83.    Mr. Augustin was so stressed that he couldn't see his girlfriend. He was distant because he felt overwhelmed.

84.    He was trying to figure out a plan and distract himself to fall asleep by watching TV, but he would see commercials about lawyers and it would make him think about the situation.

85.    Normally he destresses by going to the gym, but before the Vehicle was returned he couldn't go because he didn't have a car.

86.    Mr. Augustin was also stressed about bills because he couldn't go to work without the Vehicle. He works at Home Depot and missed two days of works as well as losing 18 hours of work.

87.    He thought from the beginning that they had stolen his car but does not know enough about the law to be sure.

88.    Mr. Augustin is passionate about being a weightlifter, which requires him to be well-rested sleeping 9-10 hours a day. During this time, it would 12:30 at night and he would not feel tired at all, he would toss and turn in bed, staring into space, wondering what his next move was to get the Vehicle and his personal property back.

89.    He would only sleep 2 hours, then get up, and have to try to go to sleep again.

90.     Not one night in the 10 days that the Vehicle was taken did he get 8 hours of sleep. He would wake up in the middle night a lot, he would just sit up and stare into space, racing thoughts of what I'm going to do, how am I going to get to school, how am I going to get to my girlfriend

91.     His mom told him he was stressing too much about it, but he couldn't help it because things kept going wrong.

92.     He would get anxious being put on hold by Defendants for as long as 2 hours.

93.     He continues to be worried about ever getting his personal property back.

94.     And he is very worried that Defendants will take the Vehicle again. He parks it where he can see it from his bedroom window.

95.     He had planned on the car lasting him ten years because of the low miles and good condition, and now he's worried the transmission will go soon and it will cost a lot to replace.

96.     He was a bit numb and in shock because when he talked to his girlfriend and friends about it, none of them had ever heard of something like this happening.

97.     He felt like he was just a little guy and the Defendants were big corporations taking advantage of him.

### D.   COUNT # 1: VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT (AS TO ALS AND AUTO II)

98.     Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

99.     The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect

consumers against debt collection abuses."  15 U.S.C. § 1692(e); *see also Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

100.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general."  *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil  actions brought by others.").

101.    The obligation allege to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative auto debt was incurred primarily for family, personal or household purposes.

102.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

103.    Defendants ALS and Auto II violated the FDCPA, specifically 15 U.S.C. § 1692f(6)  by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: taking or threatening to take any nonjudicial action to effect dispossession or disablement of property when there was no present right to possession of the property claimed as collateral through an enforceable security interest.

104.    As a result of ALS and Auto II's unfair collection practices, the Plaintiff suffered damages including inter alia, the lost use of the Vehicle and the cost of alternate transportation; having to pay for gas and tolls, and loss of time, for having to drive 75 miles to obtain possession of his vehicle; having to pay an attorney to attempt to, *inter alia*, seek to obtain his stolen personal property that was in the vehicle; the loss of the personal property in his vehicle and the loss of use of those items; and substantial emotional distress.

105.    The injuries inflicted on Plaintiff by ALS and Auto II are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

106.    Mr. Augustin suffered an economic injury that historically has provided a basis for lawsuits in American courts.

107.    Mr. Augustin's injuries are analogous to the following common law claims: conversion; trespass to chattel; private nuisance; negligence; and defamation.

108.    ALS and Auto II had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

### E.    COUNT #2: NEW YORK GENERAL BUSINESS LAW SECTION 349 ET SEQ. (AS TO ALL DEFENDANTS)

109.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

110.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

111.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both." N.Y. Gen. Bus. Law § 349(h).

112.    Defendants' actions were consumer oriented.  Conduct does not require a repetition or pattern of deception in order to be consumer oriented.

113.    Defendant committed the above described acts willfully and/or knowingly.

114.    Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

115.    As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 et seq, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, as to recover actual, treble damages, punitive and exemplary damages, together with costs and attorney's fees.

116.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

117.    Mr. Augustin suffered an economic injury that historically has provided a basis for lawsuits in American courts.

118.    Mr. Augustin's injuries are analogous to the following common law claims: conversion; trespass to chattel; private nuisance; negligence; and defamation.

119.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

### F.    COUNT #3: CONVERSION (AS TO ALL DEFENDANTS)

120.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted

and realleged herein.

121.    The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

122.    Property subject to conversion includes, *inter alia*, the Vehicle and the confiscated personal property of Mr. Augustin inside the Vehicle.

123.    Defendants intentionally and without authority, assumed and exercised control over Plaintiff's Vehicle and personal property, interfering with his right to possession of the same.

124.    The alleged lien on the Vehicle did not exist and pertained to a putative debt owed by a Thomas Markeith. Even if there had been a lien on the Vehicle, secured creditors do not have a right to repossess collateral from third parties, which all of the Defendants know or should know as experienced companies in the repossession industry.

125.    For the reasons stated in the statement of facts, the conduct of Defendants is gross, wanton or deliberate and demonstrates a high degree of moral culpability. Further, said Defendants conduct as alleged in the statement of facts demonstrates malice, insult, and/or willful or reckless disregard of Plaintiff's rights, or other aggravated acts by said Defendants. For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages against Defendants.

126.    Credit Acceptance, holding itself out as the secured creditor for the Vehicle, had a nondelegable duty imposed by N.Y. U.C.C. § 9-609 to only take possession of secured collateral after default, and to do so without breaching the peace. Credit Acceptance breached this duty and thus is directly liable for the conversion of the Vehicle and Mr. Augustin's personal property therein.

127.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

128.    Mr. Augustin suffered an economic injury that historically has provided a basis for lawsuits in American courts.

129.    Mr. Augustin's injuries are analogous to the following common law claims: conversion; trespass to chattel; private nuisance; negligence; and defamation.

130.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

### G.    COUNT #4: GROSS NEGLIGENCE (AS TO ALL DEFENDANTS)

131.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

132.    Defendants' failure to exercise even slight care or slight diligence amounts to gross negligence. Had Defendants made even the smallest effort to review either their own records or public records such as but not limited to the title history of the Vehicle, they would have known that there was no lien on the Vehicle, let alone a lien by Credit Acceptance and one in default sufficient to permit repossession.

133.    Defendants continued to interfere with return of the Vehicle to Mr. Augustin with full knowledge that the repossession was wrongful.

134.    Moreover, had ALS exercised even slight diligence in employing Auto II, it would have determined that the company was not licensed and had a history of unauthorized towing.

135.    Even minimal diligence on this issue would have alerted them to the fact that they were seeking to repossess the Vehicle without authorization, as demonstrated by the fact that Credit Acceptance confirmed to Mr. Augustin that there was not a lien before he had even sent them his copy of the title for the Vehicle.

136.    Defendants' actions evince a reckless disregard for the rights of others and smack of intentional wrongdoing, particularly the continuing refusal to this day to return the personal property that was inside the Vehicle.

137.    Upon information and belief, Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

138.    Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Mr. Augustin is entitled to a punitive damage award.

## H.    JURY DEMAND.

139.    Plaintiff demands a trial by jury.

## I.    PRAYER

140.    WHEREFORE, Plaintiff requests the following relief:

a.    A declaration Defendants have committed the violations of law alleged in this action;

b.    An order enjoining and directing Defendant to cease violating G.B.L. § 349 *et seq.*;

c.    Punitive and treble damages pursuant to G.B.L. § 349 *et seq.*

d.    Actual and statutory damages under 15 U.S.C. § 1692k;

e.    An order awarding disbursements, costs, and attorneys' fees;

f.    A judgment for actual, statutory, and punitive damages;

g.    Post judgment interest as allowed by law;

h.    All other relief, in law and in equity, both special and general, to which Plaintiff may be

justly entitled.

Dated:  Brooklyn, New York
        August 20, 2021

Respectfully submitted,
/s/
Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com